IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | 1:07CR00316-1 |
| | ) | |
| TARIK ANTAY PETTIFORD | ) | |
| | ) | |
| Defendant. | ) | |

MEMORANDUM ORDER

Tarik Pettiford is charged in a three count indictment. Count One charges possession of crack cocaine with the intent to distribute, Count Two charges possession of cocaine hydrochloride with the intent to distribute and Count Three charges possession of a firearm by a previously convicted felon. All three charges are based upon seizures made during a search of 515 South Foushee Street in Roxboro, N.C. on December 6, 2005.

Mr. Pettiford has challenged the constitutionality of the search and moved to suppress all of the items seized. He contends that the search warrant has an incorrect address of the place to be searched, that it was issued without a showing of probable cause and that the *Leon* good faith exception cannot apply because the officer obtaining the warrant made an incorrect statement to the state Magistrate

1

who issued it.

A hearing was held on December 5, 2007 and the issues were reserved. On January 25, 2008 at a status conference it was announced that the motion to suppress was denied and that a written order would issue.

I.

a.

The findings of fact and conclusions of law are contained in Parts I. and II.

About 3 p.m. on December 6, 2005 a confidential informant telephoned Detective Keith Daye of the Roxboro, N.C. Police Department to say he had just left a residence in Roxboro where he had seen Terik Pettiford with both rock and powder cocaine as well as a firearm. The informant stated that Mr. Pettiford's girlfriend and several children were also present and that Daye should act quickly because Pettiford might soon be on the move. Detective Daye was familiar with the residence, with Mr. Pettiford and with the informant. The residence was brick, next door to where "Rocky"( a person with whom the police department had a number of contacts) lived and one of three contiguous homes on that side of South Foushee Street. Daye knew that Pettiford had a previous conviction for selling cocaine and that Pettiford previously had made controlled buys from an undercover officer. Daye had worked with the informant for several years, receiving information about narcotics, armed robberies and homicides. The informant had always given accurate, reliable information. On this occasion the informant was

2

hoping that, in return for the information, Daye would put in a good word for him in an upcoming domestic case.

Daye drove by the house to get the house number. Of the three houses, only one was brick; but, Daye did not see a number on the house nor did he see the mailbox across the street. Rocky's house was 513 and Daye, mistakenly thinking the numbers ran opposite from the way they actually did, assumed the brick house was 511. He wrote that number to give to the officer preparing the search warrant. That officer, Lieutenant Wade, had also worked with the same informant and was familiar with his reliability.

Lieutenant Wade drafted a search warrant that read: "On the above date [December 6, 2005] the applicant received information that narcotics is being stored and sold at the above residence from suspect listed above [Tarik Pettiford]. This information was received from Detective Keith Daye of the Roxboro Police. Detective Daye received this information this day from a confidential reliable informant. This informant told Detective Daye that Schedule II narcotics were seen in the above residence on this date. This informant is familiar with the packaging, sale and distribution of narcotics. The CRI is deemed reliable through the conviction of suspects through the penal system."

The place to be searched was described as follows: "...a single story, light colored brick, white shutterrs (sic) and white trimming. The physical address is 511 South Foushee Street. Leaving the Roxboro PD narcotics office, travel south

3

on Foushee Street. Pass across Academy Street and continue pass (sic) Gentry Street. The residence is located on the right side of the street (down the hill). The residence is the third house."

While Lieutenant Wade prepared the search warrant affidavit and made application for the warrant, Detective Daye met with other officers, uniformed and tactical, to plan an execution of the warrant that would minimize risk to the children they expected to be present. With information that Mr. Pettiford had a firearm, the officers decided two uniformed officers would go first to Rocky's house, calling out for "Jesse Burrell". They would then go to the brick house, knock on the door and ask if Jesse Burrell were there.

Executing that plan, Officer Massey and Officer Roberson called out next door for Jesse Burrell, then went to the brick house and knocked on the door. Mr. Pettiford opened it. From where he stood, Officer Massey could see inside and recognized Joseph Downey, a person with whom he was familiar from previous narcotics encounters, sitting upon a sofa. Officer Massey asked for Jesse Burrell. Mr. Pettiford said his name was "Tarik", that he did not know a Jesse Burrell and that the only people in the house were his children, the mother of his children, Mr. Downey and Mr. Downey's girlfriend.

Upon learning that Mr. Pettiford was the person at the door, Officer Massey reached across the threshold, grabbed Mr. Pettiford's wrist and "told him we had a search warrant for him, he was going to be detained". Mr. Pettiford jerked away

4

and moved his hand toward his back pocket. The officers, fearful Mr. Pettiford was reaching for the firearm, entered the residence and began struggling with him. Mr. Pettiford was not restrained until a third officer, Detective Williams, came in to assist. Following the struggle, a package of cocaine which Mr. Pettiford acknowledged to have been in his pants pocket was found on the floor, additional packages of cocaine were found in his pants pockets and the firearm was found under a mattress in the bedroom.

b.

During the hearing, Magistrate Gentry, the state judicial official who issued the search warrant testified that, during the application process, Lieutenant Wade had made an oral statement that the confidential informant had both seen and purchased drugs that day. The parties agree that no drugs were purchased.

THE COURT: Do you have a recollection, Judge Gentry, as to what if anything Lieutenant Wade said about how the informant knew there were drugs in the house.

THE WITNESS: That the informant had seen a quantity of drugs there and had made a buy.

BY MR. LANG:

Q. Now, was the fact that there was a buy made listed in the face of the warrant?

A. I do not recall.

5

Q. Do you recall whether Wade told you that there had been a previous buy made from this Defendant or there had been a buy made from this residence?

A. That a buy had been made from the residence.

Q. Are you certain about that?

A. No. I'm not sure about that.

A. He told me that they had made a buy there. I don't remember if he told me specifically who it was from.

Q. And did you make any documentation or write any of this down at that time?

A. No.

MR. LANG: That's all, Your Honor.

THE COURT: Mr. Cochran.

BY MR. COCHRAN:

Q. Judge Gentry, was it important for you to know that there was a previous buy made at this residence?

A. It would certainly strengthen my position in issuing a warrant.

Q. I have no other questions, Your Honor.

II.

a.

"The task of the issuing magistrate is simply to make a practical, common-

sense decision whether, given all the circumstances set forth in the affidavit before him, including the "veracity" and "basis of knowledge" of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place. And the duty of a reviewing court is simply to ensure that the magistrate had a "substantial basis for … conclud[ing]" that probable cause  existed ".   Illinois v. Gates, 462 U.S. 213, 238 (1983)

While Lieutenant Wade's affidavit is not a textbook candidate, it is, nonetheless, sufficient to pass the *Gates* test.  A common sense reading would inform a neutral magistrate that a person known to the affiant as reliable (because his information had led to previous convictions) had on that very day seen controlled substances (commodities with which the informant was familiar) in the brick residence with white shutters on South Foushee Street (the last of the three which were down the hill on the right) and that, therefore, there was a fair probability that controlled substances would still be there.

b.

The Government contends that the search should be upheld even if probable cause was not sufficiently articulated in the affidavit.

In United States v. Leon, 468 U.S. 897, 920 (1984) the Supreme Court held that the exclusionary rule should not be applied to prohibit the introduction of contraband discovered in the execution of a search warrant when the officers had acted in a good faith reliance upon the validity of a warrant later found to be

7

deficient in its statement of probable cause. This exception, however, is not recognized when circumstances show the officers have not acted in good faith. For example, "if the magistrate or judge in issuing a warrant was misled by information in an affidavit that the affiant knew was false or would have known was false except for his reckless disregard of the truth" or if the affidavit "is so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable", the *Leon* exception will not apply.   See *Leon* at 923.

During the hearing, the Court opined that the *Leon* rule would not apply since Judge Gentry had testified that Lieutenant Wade orally stated that the confidential, reliable informant had purchased drugs that day.  However, after further review of the testimony, the Court is of the opinion that even if the showing of probable cause were deficient, the *Leon* exception would apply.

While Judge Gentry is confident such a statement was made, there is no showing that the statement subjectively influenced the finding of probable cause nor was it shown to be objectively material to the issuance of the warrant. Subjectively, while Magistrate Gentry testified that information about the CI making a purchase "would certainly <u>strengthen</u> my position in issuing a warrant", he did not testify nor infer that he would not have issued the warrant in the absence of that information.

Objectively, a reliable person who timely reports seeing items he recognizes as drugs creates an equally strong inference that there is a "fair probability" of

8

drugs being present as one who reports that he has purchased those drugs. Notably, Judge Gentry did not testify that the recalled statement was to the effect there had been a controlled buy or that the police had possession of those drugs as evidence.

With regard to whether reasonable officers in the position of those in this case would have reason to question the sufficiency of probable cause, Detective Daye testified about the long association he had with that informant and testified that the information he had received was always correct. He knew the information was fresh and that the informant, who was hoping to receive some assistance in return, could have no motivation but to be truthful. In addition to giving the details to Lieutenant Wade, Detective Daye had shared the information with the other officers who were going to assist in the search. The officers had reason to believe that an objective, reasonable basis supported the issuance of the search warrant and no reason to question it.

As to the description of the place to be searched, the residence in question was the only brick house in that three house area; the officers had no question which house was involved and the incorrect number: 511 instead of 515 was simply a technical error.

III.

For the reasons stated, it is determined that the search warrant in question was supported by probable cause; but, even if it were not, the drugs and firearm

9

found during the search should be allowed under the *Leon* good faith exception.

This the day of March 15, 2009

__/s/ N. Carlton Tilley, Jr.__<br>Senior United States District Judge